IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| ALLISON S. MORRIS, | |
| Plaintiff, | |
| v. | Civil Action File No. 1:22-cv- |
| GEORGIA PUBLIC SERVICE COMMISSION and THOMAS BOND, in his individual capacity, | |
| Defendants. | |

**COMPLAINT**

Plaintiff, Allison S. Morris, (hereinafter "Plaintiff" or "Ms. Morris"), by and through her counsel of record, Robert N. Marx of Marx & Marx, L.L.C., as and for her Complaint, respectfully alleges as follows:

PARTIES

1.

Plaintiff Allison S. Morris is a natural born African American female residing within the Northern District of Georgia.

2.

On information and belief, Defendant, Georgia Public Service Commission (hereinafter "GPSC") is a public agency of the State of Georgia.

1

3.

On information and belief, Defendant Thomas Bond (hereinafter "Mr. Bond") is a natural born male residing in the Northern District of Georgia.

4.

On information and belief, at all relevant times Mr. Bond has been employed by the GPSC in the capacity of Director of Utilities, an officer position recognized by the State of Georgia in O.C.G.A. § 46-2-7.1.  Mr. Bond is being sued in his individual capacity.

5.

On information and belief, Defendants are engaged in commerce as defined under the Fair Labor Standards Act ("FLSA") at 29 U.S.C.§203(b).

6.

On information and belief, the GPSC is an "enterprise engaged in commerce or in the production of goods or services for commerce" as defined in 29 U.S.C. §§203(r)(2)(C) and (s)(1)(C).

7.

The GPSC is an "employer" within the meaning of 29 U.S.C. §203(d).

8.

On information and belief at all relevant times the GPSC had and continues to have two or more employees of its enterprise individually engaged in commerce

or who otherwise individually meet the traditional test of coverage under the FLSA.

9.

Ms. Morris was individually covered by the FLSA as she utilized the instrumentalities of commerce while she performed and continues to perform her job duties for Defendants.

JURISDICTION

10.

The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§1331 and 1343 in that this is an action to recover damages for violations of Acts of Congress providing for equal rights of citizens.  The jurisdiction of this Court is also invoked pursuant to Section 216(b) of the Fair Labor Standards Act ("FLSA"), 42 U.S.C. §1981 and 42 U.S.C. §1983.  The jurisdiction of this Court is invoked under 28 U.S.C. §1367 with respect to the cause of action under Georgia law.

VENUE

11.

Venue is appropriate pursuant to 28 U.S.C. §1391 in that the Northern District of Georgia is the judicial district in which a substantial part of the events giving rise to this claim occurred.

## NATURE OF THIS ACTION

### 12.

This is a complaint of unlawful employment discrimination on the basis of Plaintiff's sex and race. The complaint seeks declaratory and permanent injunctive relief and damages for redress of rights secured to Plaintiff by 42 U.S.C. §1983, the Equal Protection Clause of the U.S. Constitution, 29 U.S.C. §206(d) ("FLSA") also known as the Equal Pay Act of 1963, 42 U.S.C. §1981, and the Equal Protection Clause of the Constitution of the State of Georgia. Plaintiff also seeks an award of attorneys' fees and costs, pursuant to the FLSA and 42 U.S.C. §1988.

## FACTS

A. Organization and Procedures of GPSC

### 13.

The GPSC is organized for budget purposes into three divisions: Administration, Utilities and Pipeline Safety/Facilities Protection. The Utilities Division has four units: electric, gas, telecommunications, and internal consultants ("IC").

### 14.

On information and belief, at all relevant times and continuing, Mr. Bond held and continues to hold the position of Director of Utilities, at the Georgia Public Service Commission, an officer position recognized in O.C.G.A. § 46-2-7.1.

15.

As a public agency of the State of Georgia, the GPSC is subject to the rules and regulations of the Georgia Department of Personnel.

16.

At all relevant times and continuing, according to the Georgia Department of Personnel, all employees employed within the Utilities Division of the GPSC have the job title of Utilities Analyst 1, 2 or 3, regardless of the employees' backgrounds, specialties or degrees conferred. Thus, while Utilities Analysts may have accounting, engineering or economist training or backgrounds, they all have the same job title of Utilities Analyst 1, 2 or 3 according to the binding rules and regulations of the Georgia Department of Personnel.

17.

Mr. Bond acknowledged that all employees in the job title of Utilities Analyst 1 were in the same job title as far as the Georgia Department of Personnel was concerned, and the same is true with all employees employed in the job titles of Utilities Analyst 2 or Utilities Analyst 3.

18.

The Georgia Department of Personnel did not and does not recognize any difference in the job titles with respect to whether the particular employee is an engineer, economist, accountant, or has any other specialty or background.

19.

On information and belief, as of fiscal year 2018, there are a total of twelve employees classified as Utilities Analyst 3, thirteen employees classified as Utilities Analyst 2 and three employees classified as Utilities Analyst 1.

20.

The job duties all Utilities Analysts requires equal levels of effort, skill and responsibility. This is true whether the Utilities Analyst is employed as a level 1, 2 or 3.

21.

The work of all Utilities Analysts is all performed at the same location under similar working conditions. This is true whether the Utilities Analyst is employed as a level 1, 2 or 3.

22.

The Internal Consultants (IC) Unit, which is within the Utilities Division, assists in cases for all other Utilities Division units at the GPSC and provides expertise to all of the other units.

23.

At all relevant times and continuing, Pandora Epps ("Ms. Epps") has been the Director of Internal Consultants at the GPSC. On information and belief, Ms. Epps has an undergraduate degree in engineering and a postgraduate degree.

24.

Pandora Epps testified that the job duties all Utilities Analysts requires equal levels of effort, skill and responsibility, and that this is true whether the Utilities Analyst is employed as a level 2 or 3.

25.

Pandora Epps testified that the work of all Utilities Analysts are performed at the same location under similar working conditions, and that this is true whether the Utilities Analyst is employed as a level 2 or 3.

26.

When a filing is made by a utility, the GPSC may decide to issue what is known as a Procedural and Scheduling Order (PSO).

27.

The PSO may assign certain Utilities Analysts to either an Advocacy Team or an Advisory Team.

28.

Utilities Analysts are not advised that a PSO is in the process of being issued and are not given an opportunity to apply for either the Advocacy or the Advisory Team.

29.

Utilities Analysts first become aware that they have been assigned to either an Advocacy Team or an Advisory Team when the PSO is issued.

30.

On information and belief, assignments to either the Advocacy Team or the Advisory Team are made by management, including at all relevant times, Mr. Bond.

31.

Ms. Epps testified that the job duties of Utilities Analysts assigned to the either Advocacy or Advisory Teams require the same effort, skill and responsibility.

32.

On information and belief, Mr. Bond's official duties at all relevant times includes and continue to include but are not limited to (1) directing the activities of the Utilities Division; (2) managing and coordinating the Commission's preparation of rate cases; (3) scheduling and coordinating all in-house, reactive, regular, and engineered audits; (4) directing all utility personnel and the preparation of that section of the Commission's budget; (5) making recommendations regarding the compensation of employees employed within the Utilities Division, and (6) performing such other duties as the Commission may establish by order. At all

relevant times, any direction regarding the activity or compensation of Utilities Analysts came from Thomas Bond.

33.

Mr. Bond acted under color of state law when making recommendations regarding the compensation of employees within the Utilities Division, including but not limited to making recommendations regarding Plaintiff's compensation.

34.

Mr. Bond acted within the scope of his discretionary authority as Director of Utilities of the GPSC when making recommendations regarding the compensation of employees within the Utilities Division, including but not limited to making recommendations regarding Plaintiff's compensation.

B.  Plaintiff paid less than male Caucasian Utilities Analysts: Robert Trokey, Steven Roetger, Tony Wackerly, Dennis Sewell (sex discrimination only) and John Kaduk

35.

Plaintiff was first employed by the GPSC on or about June 1, 2008 as a Utilities Analyst 2 at a starting salary of $65,000.

36.

Plaintiff is currently employed by the GPSC as a Utilities Analyst 3.

37.

On the first day of her employment with the GPSC, Plaintiff already had eighteen (18) years of utility regulatory experience as a utility auditor and utility analyst; approximately four (4) years of work experience through employment with the Florida Public Service Commission and approximately fourteen (14) years of work experience as a utility analyst (five of which in a supervisory role) with what is now a defunct state of Georgia agency, the Consumers' Utility Counsel, which was charged legislatively to represent the State's residential and small commercial and industrial consumers in proceedings before the GPSC . The Consumers' Utility Counsel was a division of the Georgia Governor's Office of Consumer Affairs at the time Plaintiff was hired by the GPSC. At the end of her years with the Consumers' Utility Counsel, Plaintiff was at an annual salary of $75,000. Plaintiff was then presented a Legislative Resolution commending her work on behalf of Georgia's ratepayers and highlighting Plaintiff's work experience including bringing rate relief of more than $500 million to Georgia's small businesses in rate proceedings decided by the GPSC.

38.

Plaintiff currently has approximately thirty (31) years of utility regulatory work experience.

39.

At all relevant times and continuing, Plaintiff has been paid less than male Caucasian Utilities Analysts who have been and continue to be employed in the same job title and at the same establishment as Plaintiff.

40.

At all relevant times and continuing, on the basis of her sex, Plaintiff has been paid less than male Caucasian Utilities Analysts who have been and continue to be employed in the same job title and at the same establishment as Plaintiff.

41.

In addition to Plaintiff, there has been and continues to be a pattern and practice of paying female Utilities Analysts less than male Utilities Analysts.

42.

In addition to Plaintiff, female Utilities Analysts have been paid less than male Utilities Analysts because of their sex.

43.

From the time that Plaintiff was hired in 2008 until in or about May y 2020, Plaintiff was paid less than Robert Trokey.

44.

From in or about 2008 until in or about May 2020 Mr. Trokey was employed in the same job title as Plaintiff, of Utilities Analyst.

45.

Mr. Trokey is a male Caucasian.

46.

Plaintiff was paid less and continued to be paid less than Mr. Trokey until in or about May 2020 because of her sex.

47.

Plaintiff was paid less and continued to be paid less than Mr. Trokey until in or about May 2020 because of her race.

48.

On information and belief, Mr. Bond recommended the starting salaries of Mr. Trokey and Plaintiff.

49.

On information and belief, after their initial starting salary, Mr. Bond made the recommendations regarding the subsequent salaries to be paid to Mr. Trokey and to Plaintiff.

50.

Commencing in or about 2015 and continuing to date, Plaintiff has been paid less than Steven Roetger.

51.

At all relevant times, Mr. Roetger has been employed in the same job title as Plaintiff, that of Utilities Analyst 3.

52.

Steven Roetger is a male Caucasian.

53.

Plaintiff has been paid less and continues to be paid less than Mr. Roetger because of her sex.

54.

Plaintiff has been paid less and continues to be paid less than Mr. Roetger because of her race.

55.

On information and belief, Mr. Bond recommended the starting salary for Mr. Roetger.

56.

On information and belief, Mr. Bond recommended the subsequent salaries for Mr. Roetger.

57.

Plaintiff and Mr. Roetger are employed as Utilities Analysts under the immediate supervision of Ms. Epps.

58.

Ms. Epps testified that the job duties and work that Mr. Roetger provided to the GPSC did not warrant paying him more than Ms. Morris.

59.

In 2013 Ms. Morris received a higher rating than Mr. Roetger but was being paid less than he was.

60.

From in or about 2015 to in or about 2019, Tony (George Anthony) Wackerly was paid more than Plaintiff.

61.

During that period of time, 2015 to 2019, Mr. Wackerly was employed in the same job title as Plaintiff, that of Utilities Analyst 3.

62.

Mr. Wackerly is a male Caucasian.

63.

Plaintiff was paid less than Mr. Wackerly during the period 2015 to 2019 because of her sex.

64.

Plaintiff was paid less than Mr. Wackerly during the period 2015 to 2019 because of her race.

14

65.

On information and belief, Mr. Bond recommended the salaries for Mr. Wackerly.

66.

From in or about 2008 to in or about December 2020, Dennis Sewell was paid more than Plaintiff.

67.

From in or about 2008 until in or about December 2020 Mr. Sewell was employed in the same job title as Plaintiff, of Utilities Analyst.

68.

Mr. Sewell is male.

69.

At the time Plaintiff filed her Complaint, Mr. Sewell had worked in utility regulation for twenty-three years after considering his nine and one-half years of military deployment while Plaintiff had worked in utility regulation for twenty-five years with the State of Georgia and an additional four years in Florida.

70.

Plaintiff was paid less than Mr. Sewell because of her sex.

71.

On information and belief, Mr. Bond recommended the salaries of Mr.

Sewell from in or about 2008 to in or about 2020.

72.

In 2011 Ms. Morris received a higher evaluation than Mr. Sewell.  She

received a rating of Exceeds Expectations whereas Mr. Sewell received a rating of

Meets Expectations, but Mr. Sewell was being paid more than Ms. Morris.

73.

Commencing in 2019. John Kaduk has been paid more than Plaintiff.

74.

Mr. Kaduk is employed in the same job title as Plaintiff, of Utilities Analyst

3.

75.

Mr. Kaduk is a male Caucasian.

76.

Plaintiff is being paid less than Mr. Kaduk because of her sex.

77.

Plaintiff is being paid less than Mr. Kaduk because of her race.

78.

On information and belief, Mr. Bond recommended the salaries of Mr. Kaduk from 2019 and continuing to date.

79.

On July 3, 2019, Ms. Epps sent an email to Mr. Bond in which she wrote that the disparity between Plaintiff's salary and Mr. Kaduk's salary was exacerbated by the fact that he had been receiving the highest percentage salary increases in the Internal Consultants Units for the past three years.

80.

Ms. Epps testified that there is no reason why Mr. Kaduk should be paid more than Ms. Morris.

81.

Mr. Bond testified that he did not consider Ms. Morris to be Mr. Kaduk's peer even though they had the same job classification.

82.

As of June 2019, Mr. Trokey was being paid $84,899, Mr. Sewell was being paid $89, 434, Mr. Roetger was being paid $85,513 and Mr. Wackerly was being paid $78,667; all of whom were being paid more than Ms. Morris, who was being paid $77,626.

83.

Ms. Epps testified that there was no legitimate basis for paying Mr. Trokey, Mr. Sewell, Mr. Roetger and Mr. Wackerly more than Ms. Morris.

84.

In 2009, Ms. Morris was assigned as Team Leader on an Advisory Staff, over both Mr. Roetger and Mr. Sewell, who were also assigned to the staff.

85.

In 2010, Ms. Morris was assigned as Team Leader on an Advisory Staff, over both Mr. Roetger and Mr. Sewell, who were also assigned to the staff.

86.

In 2011, Ms. Morris was assigned as Team Leader on an Advisory Staff, over Mr. Roetger who was also assigned to the staff.

87.

In 2012, Ms. Morris was assigned as Team Leader on an Advisory Staff, over Mr. Roetger who was also assigned to the staff.

88.

In 2012, Ms. Morris was assigned to an Advisory Staff and was Team Leader, over both Mr. Roetger and Mr. Sewell.

89.

In 2013, Ms. Morris was assigned as Team Leader on an Advisory Staff, over both Mr. Roetger and Mr. Sewell, who were also assigned to the staff.

90.

In 2013, Ms. Morris was assigned as Team Leader on an Advisory Staff, over Mr. Sewell who was also assigned to the staff.

91.

In 2015, Ms. Morris was assigned as Team Leader on an Advisory Group, over Mr. Roetger who was also assigned to the group

92.

In 2018, Ms. Morris was assigned as Team Leader on an Advisory Staff, over Mr. Sewell who was also assigned to the staff.

93.

In 2019, Ms. Morris was assigned as Team Leader on an Advisory Staff, over Mr. Sewell who was also assigned to the staff.

94.

In 2019, Ms. Morris was assigned as Team Leader on an Advisory Staff, over Mr. Sewell who was also assigned to the staff.

C.  Pattern of pay discrimination on the basis of sex and race:
    Daphne Jones, Julia Truss, Shemetha Jones, Janey Chauvet,
    Jamie Barber (sex discrimination only), Tara Surratt,
    Dorothy Buckner, Alicia McBride

95.

On August 14, 2007, Daphne Jones, an African American female, was hired as a Utilities Analyst, and on the following day, August 15, 2007, Mr. Trokey, a Caucasian male, was hired as a Utilities Analyst.  At the time, Ms. Jones had an engineering background and three post graduate degrees: B.S. in Electrical Engineering, MBA and Master's Degree in Project Management. Mr. Trokey did not have an engineering background and had only two postgraduate degrees.  Ms. Jones was hired at a starting salary of $55,000 and Mr. Trokey was hired at a starting salary of $68,000, $13,000 more per year than Ms. Jones.

96.

On information and belief Mr. Bond recommended the hiring and starting salary decisions of both Daphne Jones and Robert Trokey.

97.

In 2008, Julia Truss, an African American female Utilities Analyst, was being paid $58,895, and Mr. Trokey was being paid $68,000.

98.

On April 23, 2008, Sheree Kernizan, Director of the Electric Unit, sent an email to Mr. Bond in which she stated that Julia Truss' pay was still out of line as

20

compared to the other Utilities Analysts even after she had received a 5% pay increase.

99.

In 2010, Shemetha Jones, an African American female, was hired into the same job title of Utilities Analyst as John Kaduk, but at a salary $15,000 less per year.

100.

Shemetha Jones is a CPA. That is one of the disciplines that the GPSC recognizes as being difficult to recruit and retain. Ms. Jones has a postgraduate degree.

101.

Ms. Epps testified that Shemetha Jones had been hired in 2010 at a lower salary than she should have initially been paid, and that lower starting salary resulted in her continuing to be underpaid compared to her peers throughout her employment with GPSC.

102.

Ms. Epps testified that Ms. Jones' salary was subsequently raised, but the raise was inadequate and she continued to be underpaid compared to her peers.

103.

In May 2019, Ms. Epps sent an email to Mr. Bond in which she said that Shemetha Jones was still underpaid compared to her peers.

104.

As of June 2019, Shemetha Jones was still underpaid compared to her peers despite having received a rating of Exceeded Expectations.

105.

Mr. Bond testified that he made the salary recommendations regarding Shemetha Jones.

106.

In 2008, Janey Chauvet was employed in the title of Utilities Engineer 2, which subsequently became known as Utilities Analyst 2. At the same time Tony Wackerly was employed as a Utilities Analyst 1 but was being paid more than Ms. Chauvet. Mr. Bond testified that someone at Level 2 is usually paid more than someone at Level 1.  Mr. Bond testified that, on average, one would expect someone at Level 2 to be paid more than someone at Level 1.  Ms. Chauvet is an African American female, and Mr. Wackerly is a Caucasian male.

107.

Janey Chauvet has an engineering degree and was hired by the GPSC is 1996. Ms. Chauvet is a Utilities Analyst 2. John Kaduk has an engineering degree and was

hired by the GPSC in 2002. Mr. Kaduk has advanced to the level of Utilities Analyst 3.

108.

On information and belief, Mr. Bond made the salary recommendations regarding Janey Chauvet.

109.

In 2008, Jamie Barber, who was in the title of Utilities Analyst 2, was also being paid less than Mr. Wackerly, who was Utilities Analyst 1.  Jamie Barber is female.

110.

On information and belief, Mr. Bond made the salary recommendations regarding Jamie Barber.

111.

Also at the same time, in 2008, Tara Surratt, who is an African American female, was in the same title as Tony Wackerly, that of Utilities Analyst 1 but was being paid $12,000 less than Mr. Wackerly.

112.

On information and belief, Mr. Bond made the salary recommendations regarding Ms. Surratt.

113.

Also at the same time, in 2008, Dorothy Buckner, an African American female, was in the job title of Utilities Analyst 2 and was being paid less than Tony Wackerly who was in the job title of Utilities Analyst 1.

114.

On information and belief, Mr. Bond made the salary recommendations regarding Ms. Buckner.

115.

In 2014 Ms. Buckner received a higher rating than Mr. Sewell but was being paid less than he was.

116.

Alicia McBride is an African American female. In 2019 she was employed in the same job title as Robert Trokey, that of Utilities Analyst. At the time they had the same 12 years of service with GPSC. On information and belief, Ms. McBride has a postgraduate degree. Mr. Trokey was paid $24,000 more per year than Ms. McBride.

117.

On information and belief, Mr. Bond made the salary recommendations regarding Ms. McBride.

118.

In 2019, Ms. McBride was also being paid less than Ben Deitchman, who is male and Caucasian. They were employed in the same job title of Utilities Analyst. Mr. Deitchman had 3 years of service at the time and Ms. McBride had 12 years of service at the time. Mr. Deitchman was being paid $75,400 per year and Ms. McBride was being paid $59,839 per year.

119.

On information and belief, Mr. Bond made the salary recommendations regarding Mr. Deitchman.

120.

In 2019, George Brown, a male Utilities Analyst with only 1.5 years of service was also being paid more than Ms. McBride.

121.

On information and belief, Mr. Bond made the salary recommendations regarding Mr. Brown.

122.

In 2014 Ms. Buckner, Ms. McBride, Ms. Chauvet, Ms. Surratt and Shemetha Jones, were still being paid less than Mr. Wackerly, Mr. Trokey and Mr. Sewell.

123.

In 2016, Plaintiff Allison Morris, Dorothy Buckner and Shemetha Jones were all being paid less than Steven Roetger and Patrick Reinhardt, even though they were all employed in the same job title.

124.

Patrick Reinhardt is male and Caucasian.

125.

On information and belief, Mr. Bond made the salary recommendations regarding Mr. Reinhardt.

126.

In 2017, Ms. McBride, Ms. Morris, Shemetha Jones, Ms. Chauvet and Ms. Surratt were all being paid less than Steven Roetger, Robert Trokey and Dennis Sewell.

127.

In 2018, Ms. Morris, Ms. Jones, Ms. McBride, Ms. Buckner, Ms. Chauvet and Ms. Surratt were all being paid less than Mr. Roetger, Mr. Trokey and Mr. Sewell.

128.

Mr. Bond testified that as of June 2019, Dwahni Chedda, a female Utilities Analyst who had a rating of Exceeded Expectations, was paid below her peer group.

129.

Mr. Bond testified that as of June 2019, Dorothy Buckner, Tara Surratt and Alicia McBride were all paid below their peer group.

D.  GPSC failure to comply with applicable DOAS rules

130.

The GPSC is bound by the rules of and job classifications created by the Georgia Office of Administrative Services ("DOAS").

131.

The DOAS has promulgated rules applicable to GPSC through the Georgia Department of Personnel.

132.

§478-1-.10 of the rules of the Georgia Department of Personnel requires all public agencies of Georgia, including GPSC to have a classification system in place for all jobs into which employees are hired.

133.

At all relevant times and continuing to date, the GPSC did not and does not have a classification system in place for all jobs into which employees are hired.

134.

§478-1-.11 of the rules of the Georgia Department of Personnel requires all public agencies of Georgia, including GPSC, to have salary ranges for all jobs, indicating minimum, mid-point and maximum salaries for all jobs within a pay grade.

135.

At all relevant times and continuing to date, the GPSC did not and does not have salary ranges for jobs, including jobs within the Utilities Division.

136.

Mr. Bond testified that there may have been salary ranges sometime in the past but he is not aware of any salary ranges in the recent past or existing at this time.

137.

Mr. Bond testified that he made and continues to make recommendations regarding initial salary upon hire and subsequent salary increases for employees within the Utilities Division without reference to any salary ranges.

138.

§478-1-.12 of the rules of the Georgia Department of Personnel requires all public agencies of Georgia, including GPSC, to have a compensation plan for employees, including a plan for performance-based salary increases resulting from annual performance evaluations.

139.

At all relevant times and continuing, GPSC did not have and does not have any compensation plan for employees.

140.

§478-1-.13 of the rules of the Georgia Department of Personnel requires all public agencies of Georgia, including GPSC, to have a hiring incentive program for recruiting employees who have background in areas that are difficult to recruit.

141.

At all relevant times and continuing to date, the GPSC did not and does not have a hiring incentive program.

142.

§478-1-.14 of the rules of the Georgia Department of Personnel requires all public agencies of Georgia, including GPSC, to give employees annual performance evaluations.

143.

Mr. Bond testified that the GPSC has not given its employees annual performance evaluations since at least 2010.  The performance ratings referred to previously were just the *ad hoc* judgments made by supervisors, without notice to the respective employees and without affording the respective employees the opportunity to comment, or to improve regarding alleged performance deficiencies, as would be required with annual formal performance evaluations.

144.

The GPSC has failed and continues to fail to follow State Personnel Board's rules with respect to developing internal processes for classification, compensation, pay for performance, and performance management, including processes involved in defining job classes, establishing and applying associated minimum qualifications, assigning jobs to appropriate state-wide pay ranges, developing and applying applicant screening methods and measuring worker effectiveness.

145.

On information and belief, Defendants have not conducted any audit of pay equity in at least a decade.

146.

Defendants' failure to comply with the aforesaid applicable rules, which rules are designed to confine administrative discretion within specified limits, has

resulted in Defendants arrogating unto themselves *de facto* unbridled discretion to discriminate against female and African American employees, including Plaintiff, on the basis of their sex and/or race.

FIRST CAUSE OF ACTION
(42 U.S.C. §1981 race discrimination)
(Against the GPSC)

147.

Plaintiff re-alleges each and every allegation contained in Paragraphs 1 through 146 to the same force and effect as if set forth separately herein.

148.

In particular, at all relevant times Thomas Bond has been employed by the GPSC in the capacity of Director of Utilities which is an officer position recognized by the State of Georgia in O.C.G.A. § 46-2-7.1

149.

At all relevant times and continuing, according to the Georgia Department of Personnel, all employees employed within the Utilities Division of the GPSC have the job title of Utilities Analyst 1, 2 or 3, regardless of the employees' backgrounds, specialties or degrees conferred.  Thus, while Utilities Analysts may have accounting, engineering or economist training or backgrounds, they all have the same job title of Utilities Analyst 1, 2 or 3 according to the binding rules and regulations of the Georgia Department of Personnel.

150.

Mr. Bond acknowledged that all employees in the job title of Utilities Analyst 1 were in the same job title as far as the Georgia Department of Personnel was concerned, and the same is true with all employees employed in the job titles of Utilities Analyst 2 or Utilities Analyst 3.  The Georgia Department of Personnel did not and does not recognize any difference in the job titles with respect to whether the particular employee is an engineer, economist, accountant, or has any other specialty or background.

151.

The job duties all Utilities Analysts in any particular job title, whether Utilities Analyst 1, 2 or 3 requires equal levels of effort, skill and responsibility. Thus for example, job duties for all job titles within Utilities Analyst 1 require the same level of effort skill and responsibility. Similarly the job duties for all Utilities Analyst 2 require the same level of effort, skill and responsibility, and the same is true for Utilities Analyst 3.

152.

The work of all Utilities Analysts is all performed at the same location under similar working conditions.  This is true whether the Utilities Analyst is employed as a level 1, 2 or 3.

153.

The Internal Consultants (IC) Unit, which is within the Utilities Division, assists in cases for all other Utilities Division units at the GPSC and provides expertise to all of the other units.

154.

Pandora Epps ("Ms. Epps"), the Director of Internal Consultants at the GPSC within the Utilities Division of the GPSC affirmed that the job duties within any level of Utilities Analyst position, whether Utilities Analyst 1, 2 or 3, requires equal levels of effort, skill and responsibility.

155.

Pandora Epps also affirmed that the work of all Utilities Analysts is all performed at the same location under similar working conditions.  This is true whether the Utilities Analyst is employed as a level 2 or 3.

156.

When a filing is made by a utility, the GPSC may decide to issue what is known as a Procedural and Scheduling Order (PSO).

157.

The PSO may assign certain Utilities Analysts to either an Advocacy Team or an Advisory Team.

158.

Utilities Analysts are not advised that a PSO is in the process of being issued and are not given an opportunity to apply for either the Advocacy or the Advisory Team.

159.

Utilities Analysts first become aware that they have been assigned to either an Advocacy Team or an Advisory Team when the PSO is issued.

160.

On information and belief, assignments to either the Advocacy Team or the Advisory Team are made by management, including at all relevant times, Mr. Bond.

161.

Ms. Epps testified that the job duties of Utilities Analysts assigned to the either Advocacy or Advisory Teams require the same effort, skill and responsibility.

162.

In particular, at all relevant times Thomas Bond has been employed by the GPSC in the capacity of Director of Utilities which is an officer position recognized by the State of Georgia in O.C.G.A. § 46-2-7.1

163.

In his capacity as Director of Utilities of the GPSC Thomas Bond exercised operational control by virtue of his job duties that included  but were not limited to (1) directing the activities of the Utilities Division; (2) managing and coordinating the Commission's preparation of rate cases; (3) scheduling and coordinating all in-house, reactive, regular, and engineered audits; (4) directing all utility personnel and the preparation of that section of the Commission's budget; (5) making recommendations regarding the compensation of employees employed within the Utilities Division, and (6) performing such other duties as the Commission may establish by order. Any direction regarding the activity or compensation of Utilities Analysts came from Thomas Bond.

164.

At all relevant times Thomas Bond made the decisions relating to the starting and subsequent salaries for employees occupying the Analyst 1, 2 and 3 job titles, including plaintiff within the Utilities Division of the GPSC.

165.

African American female employees' starting salaries, including Plaintiff's as compared to similarly situated male employees in the same job title doing the same work, were routinely lower than the salaries for male employees.

166.

Starting salaries of Caucasian male employees doing the same work as female employees, including plaintiff, in the same job title were not based on seniority, qualification, or experience or any factor other than sex.

167.

Plaintiff was paid less and continues to be paid less than male Caucasian employees for the same work.

168.

Plaintiff was paid less and continues to be paid less than male Caucasian employees for the same work because of her race.

169.

Defendants' aforesaid actions violated 42 U.S.C. §1981.

170.

Plaintiff has suffered damages because of Defendants' actions.

171.

Plaintiff is entitled to relief to remedy Defendants' actions.

SECOND CAUSE OF ACTION
(42 U.S.C. §1981 – race discrimination)
(Against Thomas Bond in his Individual Capacity )

172.

Plaintiff re-alleges each and every allegation contained in Paragraphs 1 through 146 to the same force and effect as if set forth separately herein.

173.

In particular, at all relevant times Thomas Bond has been employed by the GPSC in the capacity of Director of Utilities which is an officer position recognized by the State of Georgia in O.C.G.A. § 46-2-7.1

174.

At all relevant times Thomas Bond acted under color of state law.

175.

At all relevant times and continuing, according to the Georgia Department of Personnel, all employees employed within the Utilities Division of the GPSC have the job title of Utilities Analyst 1, 2 or 3, regardless of the employees' backgrounds, specialties or degrees conferred.  Thus, while Utilities Analysts may have accounting, engineering or economist training or backgrounds, they all have the same job title of Utilities Analyst 1, 2 or 3 according to the binding rules and regulations of the Georgia Department of Personnel.

176.

Mr. Bond acknowledged that all employees in the job title of Utilities Analyst 1 were in the same job title as far as the Georgia Department of Personnel was concerned, and the same is true with all employees employed in the job titles of Utilities Analyst 2 or Utilities Analyst 3. The Georgia Department of Personnel did not and does not recognize any difference in the job titles with respect to whether the particular employee is an engineer, economist, accountant, or has any other specialty or background.

177.

The job duties all Utilities Analysts in any particular job title, whether Utilities Analyst 1, 2 or 3 requires equal levels of effort, skill and responsibility. Thus for example, job duties for all job titles within Utilities Analyst 1 require the same level of effort skill and responsibility. Similarly the job duties for all Utilities Analyst 2 require the same level of effort, skill and responsibility, and the same is true for Utilities Analyst 3.

178.

The work of all Utilities Analysts is all performed at the same location under similar working conditions. This is true whether the Utilities Analyst is employed as a level 1, 2 or 3.

179.

The Internal Consultants (IC) Unit, which is within the Utilities Division, assists in cases for all other Utilities Division units at the GPSC and provides expertise to all of the other units.

180.

Pandora Epps ("Ms. Epps"), the Director of Internal Consultants at the GPSC within the Utilities Division of the GPSC affirmed that the job duties within any level of Utilities Analyst position, whether Utilities Analyst 1, 2 or 3, requires equal levels of effort, skill and responsibility.

181.

Pandora Epps also affirmed that the work of all Utilities Analysts is all performed at the same location under similar working conditions.  This is true whether the Utilities Analyst is employed as a level 2 or 3.

182.

When a filing is made by a utility, the GPSC may decide to issue what is known as a Procedural and Scheduling Order (PSO).

183.

The PSO may assign certain Utilities Analysts to either an Advocacy Team or an Advisory Team.

184.

Utilities Analysts are not advised that a PSO is in the process of being issued and are not given an opportunity to apply for either the Advocacy or the Advisory Team.

185.

Utilities Analysts first become aware that they have been assigned to either an Advocacy Team or an Advisory Team when the PSO is issued.

186.

On information and belief, assignments to either the Advocacy Team or the Advisory Team are made by management, including at all relevant times, Mr. Bond.

187.

Ms. Epps testified that the job duties of Utilities Analysts assigned to the either Advocacy or Advisory Teams require the same effort, skill and responsibility.

188.

In particular, at all relevant times Thomas Bond has been employed by the GPSC in the capacity of Director of Utilities which is an officer position recognized by the State of Georgia in O.C.G.A. § 46-2-7.1

189.

In his capacity as Director of Utilities of the GPSC Thomas Bond exercised operational control by virtue of his job duties that included  but were not limited to (1) directing the activities of the Utilities Division; (2) managing and coordinating the Commission's preparation of rate cases; (3) scheduling and coordinating all in-house, reactive, regular, and engineered audits; (4) directing all utility personnel and the preparation of that section of the Commission's budget; (5) making recommendations regarding the compensation of employees employed within the Utilities Division, and (6) performing such other duties as the Commission may establish by order. Any direction regarding the activity or compensation of Utilities Analysts came from Thomas Bond.

190.

At all relevant times Thomas Bond made the decisions relating to the starting and subsequent salaries for employees occupying the Analyst 1, 2 and 3 job titles, including plaintiff within the Utilities Division of the GPSC.

191.

On information and belief, Mr. Bond recommended the starting salaries of Mr. Trokey and Plaintiff.

192.

On information and belief, after their initial starting salary, Mr. Bond made the recommendations regarding the subsequent salaries to be paid to Mr. Trokey and to Plaintiff.

193.

On information and belief, Mr. Bond recommended the starting salary for Mr. Roetger.

194.

On information and belief, Mr. Bond recommended the subsequent salaries for Mr. Roetger.

195.

On information and belief, Mr. Bond recommended the salaries for Mr. Wackerly.

196.

On information and belief, Mr. Bond recommended the salaries of Mr. Sewell from in or about 2008 to in or about 2020.

197.

On information and belief, Mr. Bond recommended the salaries of Mr. Kaduk from 2019 and continuing to date.

198.

Mr. Bond testified that he did not consider Ms. Morris to be Mr. Kaduk's peer even though they had the same job classification.

199.

On information and belief Mr. Bond recommended the hiring and starting salary decisions of both Daphne Jones and Robert Trokey.

200.

Mr. Bond testified that he made the salary recommendations regarding Shemetha Jones.

201.

On information and belief, Mr. Bond made the salary recommendations regarding Janey Chauvet.

202.

On information and belief, Mr. Bond made the salary recommendations regarding Jamie Barber.

203.

On information and belief, Mr. Bond made the salary recommendations regarding Ms. Surratt.

204.

On information and belief, Mr. Bond made the salary recommendations regarding Ms. Buckner.

205.

On information and belief, Mr. Bond made the salary recommendations regarding Ms. McBride.

206.

On information and belief, Mr. Bond made the salary recommendations regarding Mr. Deitchman.

207.

On information and belief, Mr. Bond made the salary recommendations regarding Mr. Brown.

208.

On information and belief, Mr. Bond made the salary recommendations regarding Mr. Reinhardt.

209.

Mr. Bond testified that he made and continues to make recommendations regarding initial salary upon hire and subsequent salary increases for employees within the Utilities Division without reference to any salary ranges.

210.

At all relevant times Thomas Bond made the decisions relating to the starting and subsequent salaries for employees occupying the Analyst 1, 2 and 3 job titles, including plaintiff within the Utilities Division of the GPSC.

211.

Thomas Bond set the starting salaries of male employees doing the same work as female employees in the same job title within the Utilities Division of the GPSC.

212.

Mr. Bond acted within the scope of his discretionary authority as Director of Utilities of the GPSC when making recommendations regarding the compensation of employees within the Utilities Division, including but not limited to making recommendations regarding Plaintiff's compensation.

213.

African American female employees' starting salaries, including Plaintiff's as compared to similarly situated male employees in the same job title doing the same work, were routinely lower than the salaries for male employees.

214.

Starting salaries of Caucasian male employees doing the same work as female employees, including Plaintiff, in the same job title were not based on seniority, qualification, or experience or any factor other than sex.

215.

Plaintiff was paid less and continues to be paid less than male Caucasian employees for the same work.

216.

Plaintiff was paid less and continues to be paid less than male Caucasian employees for the same work because of her race.

217.

It was clearly established at the time of the race discrimination alleged in this Complaint that discrimination in pay based on race is illegal under 42 U.S.C. §1981.

218.

Defendant Thomas Bond is not entitled to qualified immunity in his individual capacity since he acted within his discretionary authority as Director of Utilities with respect to setting compensation for Plaintiff and her Caucasian male comparators, and since the right to be free from race discrimination in pay was clearly established at all relevant times to the actions in this complaint.

219.

Plaintiff has suffered damages because of Defendants' actions.

220.

Plaintiff is entitled to relief to remedy Defendants' actions.

THIRD CAUSE OF ACTION
(Equal Protection of the Law
under the U. S. Constitution)
(42 U.S.C. §1983)
(Against the GPSC)

221.

Plaintiff re-alleges each and every allegation contained in Paragraphs 1 through 146 to the same force and effect as if set forth separately herein.

222.

Plaintiff was paid less and continues to be paid less than male Caucasian employees for the same work.

223.

Plaintiff was paid less and continues to be paid less than male Caucasian employees for the same work because of her race.

224.

Plaintiff was paid less and continues to be paid less than male Caucasian employees for the same work because of her sex.

225.

Defendants' aforesaid actions violated the Equal Protection Clause of the

United States Constitution.

226.

Plaintiff has suffered damages because of Defendants' actions.

227.

Plaintiff is entitled to relief to remedy Defendants' actions.

FOURTH CAUSE OF ACTION
Equal Protection of the Law
under the U. S. Constitution)
(42 U.S.C. §1983)
(Against Thomas Bond in his Individual Capacity )

228.

Plaintiff re-alleges each and every allegation contained in Paragraphs 1

through 146 to the same force and effect as if set forth separately herein.

229.

In particular, at all relevant times Thomas Bond has been employed by the

GPSC in the capacity of Director of Utilities which is an officer position

recognized by the State of Georgia in O.C.G.A. § 46-2-7.1

230.

At all relevant times Thomas Bond acted under color of state law.

231.

At all relevant times and continuing, according to the Georgia Department of Personnel, all employees employed within the Utilities Division of the GPSC have the job title of Utilities Analyst 1, 2 or 3, regardless of the employees' backgrounds, specialties or degrees conferred.  Thus, while Utilities Analysts may have accounting, engineering or economist training or backgrounds, they all have the same job title of Utilities Analyst 1, 2 or 3 according to the binding rules and regulations of the Georgia Department of Personnel.

232.

Mr. Bond acknowledged that all employees in the job title of Utilities Analyst 1 were in the same job title as far as the Georgia Department of Personnel was concerned, and the same is true with all employees employed in the job titles of Utilities Analyst 2 or Utilities Analyst 3.  The Georgia Department of Personnel did not and does not recognize any difference in the job titles with respect to whether the particular employee is an engineer, economist, accountant, or has any other specialty or background.

233.

The job duties all Utilities Analysts in any particular job title, whether Utilities Analyst 1, 2 or 3 requires equal levels of effort, skill and responsibility. Thus for example, job duties for all job titles within Utilities Analyst 1 require the

same level of effort skill and responsibility. Similarly the job duties for all Utilities

Analyst 2 require the same level of effort, skill and responsibility, and the same is

true for Utilities Analyst 3.

234.

The work of all Utilities Analysts is all performed at the same location under

similar working conditions.  This is true whether the Utilities Analyst is employed

as a level 1, 2 or 3.

235.

 The Internal Consultants (IC) Unit, which is within the Utilities Division,

assists in cases for all other Utilities Division units at the GPSC and provides

expertise to all of the other units.

236.

Pandora Epps ("Ms. Epps"), the Director of Internal Consultants at the

GPSC within the Utilities Division of the GPSC affirmed that the job duties within

any level of Utilities Analyst position, whether Utilities Analyst 1, 2 or 3, requires

equal levels of effort, skill and responsibility.

237.

Pandora Epps also affirmed that the work of all Utilities Analysts is all

performed at the same location under similar working conditions.  This is true

whether the Utilities Analyst is employed as a level 2 or 3.

238.

When a filing is made by a utility, the GPSC may decide to issue what is known as a Procedural and Scheduling Order (PSO).

239.

The PSO may assign certain Utilities Analysts to either an Advocacy Team or an Advisory Team.

240.

Utilities Analysts are not advised that a PSO is in the process of being issued and are not given an opportunity to apply for either the Advocacy or the Advisory Team.

241.

Utilities Analysts first become aware that they have been assigned to either an Advocacy Team or an Advisory Team when the PSO is issued.

242.

On information and belief, assignments to either the Advocacy Team or the Advisory Team are made by management, including at all relevant times. Mr. Bond.

243.

Ms. Epps testified that the job duties of Utilities Analysts assigned to the either Advocacy or Advisory Teams require the same effort, skill and responsibility.

244.

In particular, at all relevant times Thomas Bond has been employed by the GPSC in the capacity of Director of Utilities which is an officer position recognized by the State of Georgia in O.C.G.A. § 46-2-7.1

245.

In his capacity as Director of Utilities of the GPSC Thomas Bond exercised operational control by virtue of his job duties that included  but were not limited to (1) directing the activities of the Utilities Division; (2) managing and coordinating the Commission's preparation of rate cases; (3) scheduling and coordinating all in-house, reactive, regular, and engineered audits; (4) directing all utility personnel and the preparation of that section of the Commission's budget; (5) making recommendations regarding the compensation of employees employed within the Utilities Division, and (6) performing such other duties as the Commission may establish by order. Any direction regarding the activity or compensation of Utilities Analysts came from Thomas Bond.

246.

At all relevant times Thomas Bond made the decisions relating to the starting and subsequent salaries for employees occupying the Analyst 1, 2 and 3 job titles, including plaintiff within the Utilities Division of the GPSC.

247.

On information and belief, Mr. Bond recommended the starting salaries of Mr. Trokey and Plaintiff.

248.

On information and belief, after their initial starting salary, Mr. Bond made the recommendations regarding the subsequent salaries to be paid to Mr. Trokey and to Plaintiff.

249.

On information and belief, Mr. Bond recommended the starting salary for Mr. Roetger.

250.

On information and belief, Mr. Bond recommended the subsequent salaries for Mr. Roetger.

251.

On information and belief, Mr. Bond recommended the salaries for Mr. Wackerly.

252.

On information and belief, Mr. Bond recommended the salaries of Mr. Sewell from in or about 2008 to in or about 2020.

253.

On information and belief, Mr. Bond recommended the salaries of Mr. Kaduk from 2019 and continuing to date.

254.

Mr. Bond testified that he did not consider Ms. Morris to be Mr. Kaduk's peer even though they had the same job classification.

255.

On information and belief Mr. Bond recommended the hiring and starting salary decisions of both Daphne Jones and Robert Trokey.

256.

Mr. Bond testified that he made the salary recommendations regarding Shemetha Jones.

257.

On information and belief, Mr. Bond made the salary recommendations regarding Janey Chauvet.

258.

On information and belief, Mr. Bond made the salary recommendations regarding Jamie Barber.

259.

On information and belief, Mr. Bond made the salary recommendations regarding Ms. Surratt.

260.

On information and belief, Mr. Bond made the salary recommendations regarding Ms. Buckner.

261.

On information and belief, Mr. Bond made the salary recommendations regarding Ms. McBride.

262.

On information and belief, Mr. Bond made the salary recommendations regarding Mr. Deitchman.

263.

On information and belief, Mr. Bond made the salary recommendations regarding Mr. Brown.

264.

On information and belief, Mr. Bond made the salary recommendations regarding Mr. Reinhardt.

265.

Mr. Bond testified that he made and continues to make recommendations regarding initial salary upon hire and subsequent salary increases for employees within the Utilities Division without reference to any salary ranges.

266.

At all relevant times Thomas Bond made the decisions relating to the starting and subsequent salaries for employees occupying the Analyst 1, 2 and 3 job titles, including plaintiff within the Utilities Division of the GPSC.

267.

Thomas Bond set the starting salaries of male employees doing the same work as female employees in the same job title within the Utilities Division of the GPSC.

268.

Mr. Bond acted within the scope of his discretionary authority as Director of Utilities of the GPSC when making recommendations regarding the compensation of employees within the Utilities Division, including but not limited to making recommendations regarding Plaintiff's compensation.

269.

African American female employees' starting salaries, including Plaintiff's as compared to similarly situated male employees in the same job title doing the same work, were routinely lower than the salaries for male employees.

270.

Starting salaries of Caucasian male employees doing the same work as female employees, including Plaintiff, in the same job title were not based on seniority, qualification, or experience or any other legal factor.

271.

Plaintiff was paid less and continues to be paid less than male Caucasian employees for the same work.

272.

Plaintiff was paid less and continues to be paid less than male Caucasian employees for the same work because of her sex.

273.

Plaintiff was paid less and continues to be paid less than male Caucasian employees for the same work because of her race.

274.

It was clearly established at the time of the race discrimination alleged in this Complaint that discrimination in pay based on race is illegal under 42 U.S.C. §1981 as well as the Equal Protection Clause of the United States Constitution.

275.

It was clearly established at the time of the sex discrimination alleged in this Complaint that discrimination in pay based on sex is illegal under the Equal Protection Act of the United States Constitution.

276.

Defendant Thomas Bond is not entitled to qualified immunity in his individual capacity since he acted within his discretionary authority as Director of Utilities with respect to setting compensation for Plaintiff and her Caucasian male comparators, and since the right to be free from race and/or sex discrimination in pay was clearly established at all relevant times to the actions in this complaint.

277.

Plaintiff has suffered damages because of Defendants' actions.

278.

Plaintiff is entitled to relief to remedy Defendants' actions.

FIFTH CAUSE OF ACTION
(Equal Protection of the Law
under the Georgia Constitution)
(Against the GPSC )

279.

Plaintiff re-alleges each and every allegation contained in Paragraphs 1 through 146 to the same force and effect as if set forth separately herein.

280.

Plaintiff was paid less and continues to be paid less than male Caucasian employees for the same work.

281.

Defendants' aforesaid actions violated the Equal Protection Clause of the Georgia Constitution.

282.

Plaintiff has suffered damages because of Defendants' actions.

283.

Plaintiff is entitled to relief to remedy Defendants' actions.

SIXTH CAUSE OF ACTION
(Equal Protection of the Law
under the Georgia Constitution)
(Against Thomas Bond individually)

284.

Plaintiff re-alleges each and every allegation contained in Paragraphs 1 through 146 to the same force and effect as if set forth separately herein.

285.

In particular, at all relevant times Thomas Bond has been employed by the GPSC in the capacity of Director of Utilities which is an officer position recognized by the State of Georgia in O.C.G.A. § 46-2-7.1

286.

At all relevant times Thomas Bond acted under color of state law.

287.

At all relevant times and continuing, according to the Georgia Department of Personnel, all employees employed within the Utilities Division of the GPSC have the job title of Utilities Analyst 1, 2 or 3, regardless of the employees' backgrounds, specialties or degrees conferred.  Thus, while Utilities Analysts may have accounting, engineering or economist training or backgrounds, they all have the same job title of Utilities Analyst 1, 2 or 3 according to the binding rules and regulations of the Georgia Department of Personnel.

288.

Mr. Bond acknowledged that all employees in the job title of Utilities Analyst 1 were in the same job title as far as the Georgia Department of Personnel was concerned, and the same is true with all employees employed in the job titles of Utilities Analyst 2 or Utilities Analyst 3.  The Georgia Department of Personnel did not and does not recognize any difference in the job titles with respect to whether the particular employee is an engineer, economist, accountant, or has any other specialty or background.

289.

The job duties all Utilities Analysts in any particular job title, whether Utilities Analyst 1, 2 or 3 requires equal levels of effort, skill and responsibility. Thus for example, job duties for all job titles within Utilities Analyst 1 require the same level of effort skill and responsibility. Similarly the job duties for all Utilities Analyst 2 require the same level of effort, skill and responsibility, and the same is true for Utilities Analyst 3.

290.

The work of all Utilities Analysts is all performed at the same location under similar working conditions.  This is true whether the Utilities Analyst is employed as a level 1, 2 or 3.

291.

The Internal Consultants (IC) Unit, which is within the Utilities Division, assists in cases for all other Utilities Division units at the GPSC and provides expertise to all of the other units.

292.

Pandora Epps ("Ms. Epps"), the Director of Internal Consultants at the GPSC within the Utilities Division of the GPSC affirmed that the job duties within any level of Utilities Analyst position, whether Utilities Analyst 1, 2 or 3, requires equal levels of effort, skill and responsibility.

293.

Pandora Epps also affirmed that the work of all Utilities Analysts is all performed at the same location under similar working conditions.  This is true whether the Utilities Analyst is employed as a level 2 or 3.

294.

When a filing is made by a utility, the GPSC may decide to issue what is known as a Procedural and Scheduling Order (PSO).

295.

The PSO may assign certain Utilities Analysts to either an Advocacy Team or an Advisory Team.

296.

Utilities Analysts are not advised that a PSO is in the process of being issued and are not given an opportunity to apply for either the Advocacy or the Advisory Team.

297.

Utilities Analysts first become aware that they have been assigned to either an Advocacy Team or an Advisory Team when the PSO is issued.

298.

On information and belief, assignments to either the Advocacy Team or the Advisory Team are made by management, including at all relevant times. Mr. Bond.

299.

Ms. Epps testified that the job duties of Utilities Analysts assigned to the either Advocacy or Advisory Teams require the same effort, skill and responsibility.

300.

In his capacity as Director of Utilities of the GPSC Thomas Bond exercised operational control by virtue of his job duties that included  but were not limited to (1) directing the activities of the Utilities Division; (2) managing and coordinating the Commission's preparation of rate cases; (3) scheduling and coordinating all in-

house, reactive, regular, and engineered audits; (4) directing all utility personnel and the preparation of that section of the Commission's budget; (5) making recommendations regarding the compensation of employees employed within the Utilities Division, and (6) performing such other duties as the Commission may establish by order. Any direction regarding the activity or compensation of Utilities Analysts came from Thomas Bond.

301.

At all relevant times Thomas Bond made the decisions relating to the starting and subsequent salaries for employees occupying the Analyst 1, 2 and 3 job titles, including plaintiff within the Utilities Division of the GPSC.

302.

On information and belief, Mr. Bond recommended the starting salaries of Mr. Trokey and Plaintiff.

303.

On information and belief, after their initial starting salary, Mr. Bond made the recommendations regarding the subsequent salaries to be paid to Mr. Trokey and to Plaintiff.

304.

On information and belief, Mr. Bond recommended the starting salary for Mr. Roetger.

305.

On information and belief, Mr. Bond recommended the subsequent salaries for Mr. Roetger.

306.

On information and belief, Mr. Bond recommended the salaries for Mr. Wackerly.

307.

On information and belief, Mr. Bond recommended the salaries of Mr. Sewell from in or about 2008 to in or about 2020.

308.

On information and belief, Mr. Bond recommended the salaries of Mr. Kaduk from 2019 and continuing to date.

309.

Mr. Bond testified that he did not consider Ms. Morris to be Mr. Kaduk's peer even though they had the same job classification.

310.

On information and belief Mr. Bond recommended the hiring and starting salary decisions of both Daphne Jones and Robert Trokey.

311.

Mr. Bond testified that he made the salary recommendations regarding Shemetha Jones.

312.

On information and belief, Mr. Bond made the salary recommendations regarding Janey Chauvet.

313.

On information and belief, Mr. Bond made the salary recommendations regarding Jamie Barber.

314.

On information and belief, Mr. Bond made the salary recommendations regarding Ms. Surratt.

315.

On information and belief, Mr. Bond made the salary recommendations regarding Ms. Buckner.

316.

On information and belief, Mr. Bond made the salary recommendations regarding Ms. McBride.

317.

On information and belief, Mr. Bond made the salary recommendations regarding Mr. Deitchman.

318.

On information and belief, Mr. Bond made the salary recommendations regarding Mr. Brown.

319.

On information and belief, Mr. Bond made the salary recommendations regarding Mr. Reinhardt.

320.

Mr. Bond testified that he made and continues to make recommendations regarding initial salary upon hire and subsequent salary increases for employees within the Utilities Division without reference to any salary ranges.

321.

At all relevant times Thomas Bond made the decisions relating to the starting and subsequent salaries for employees occupying the Analyst 1, 2 and 3 job titles, including plaintiff within the Utilities Division of the GPSC.

322.

Thomas Bond set the starting salaries of male employees doing the same work as female employees in the same job title within the Utilities Division of the GPSC.

323.

Mr. Bond acted within the scope of his discretionary authority as Director of Utilities of the GPSC when making recommendations regarding the compensation of employees within the Utilities Division, including but not limited to making recommendations regarding Plaintiff's compensation.

324.

African American female employees' starting salaries, including Plaintiff's as compared to similarly situated male employees in the same job title doing the same work, were routinely lower than the salaries for male employees.

325.

Starting salaries of Caucasian male employees doing the same work as female employees, including Plaintiff, in the same job title were not based on seniority, qualification, or experience or any other legal factor.

326.

Plaintiff was paid less and continues to be paid less than male Caucasian employees for the same work.

327.

Plaintiff was paid less and continues to be paid less than male Caucasian employees for the same work because of her sex.

328.

Plaintiff was paid less and continues to be paid less than male Caucasian employees for the same work because of her race.

329.

It was clearly established at the time of the race discrimination alleged in this Complaint that discrimination in pay based on race is illegal under Equal Protection Clause of the Georgia Constitution.

330.

It was clearly established at the time of the sex discrimination alleged in this Complaint that discrimination in pay based on sex is illegal under the Equal Protection Act of the Georgia Constitution.

331.

Defendant Thomas Bond is not entitled to qualified immunity in his individual capacity since he acted within his discretionary authority as Director of Utilities with respect to setting compensation for Plaintiff and her Caucasian male comparators, and since the right to be free from race and/or sex discrimination in pay was clearly established at all relevant times to the actions in this complaint.

332.

Plaintiff has suffered damages because of Defendants' actions.

333.

Plaintiff is entitled to relief to remedy Defendants' actions.

SEVENTH CAUSE OF ACTION
(Equal Pay Act)
(Against Thomas Bond Individually)

334.

Plaintiff re-alleges each and every allegation contained in Paragraphs 1 through 146 to the same force and effect as if set forth separately herein.

335.

In particular, at all relevant times Thomas Bond has been employed by the GPSC in the capacity of Director of Utilities which is an officer position recognized by the State of Georgia in O.C.G.A. § 46-2-7.1

336.

At all relevant times Thomas Bond acted under color of state law.

337.

In his capacity as Director of Utilities of the GPSC Thomas Bond exercised operational control by virtue of his job duties that included  but were not limited to (1) directing the activities of the Utilities Division; (2) managing and coordinating the Commission's preparation of rate cases; (3) scheduling and coordinating all in-

house, reactive, regular, and engineered audits; (4) directing all utility personnel and the preparation of that section of the Commission's budget; (5) making recommendations regarding the compensation of employees employed within the Utilities Division, and (6) performing such other duties as the Commission may establish by order. Any direction regarding the activity or compensation of Utilities Analysts came from Thomas Bond.

338.

At all relevant times Thomas Bond made the decisions relating to the starting and subsequent salaries for employees occupying the Analyst 1, 2 and 3 job titles, including plaintiff within the Utilities Division of the GPSC.

339.

On information and belief, Mr. Bond recommended the starting salaries of Mr. Trokey and Plaintiff.

340.

On information and belief, after their initial starting salary, Mr. Bond made the recommendations regarding the subsequent salaries to be paid to Mr. Trokey and to Plaintiff.

341.

On information and belief, Mr. Bond recommended the starting salary for Mr. Roetger.

342.

On information and belief, Mr. Bond recommended the subsequent salaries for Mr. Roetger.

343.

On information and belief, Mr. Bond recommended the salaries for Mr. Wackerly.

344.

On information and belief, Mr. Bond recommended the salaries of Mr. Sewell from in or about 2008 to in or about 2020.

345.

On information and belief, Mr. Bond recommended the salaries of Mr. Kaduk from 2019 and continuing to date.

346.

Mr. Bond testified that he did not consider Ms. Morris to be Mr. Kaduk's peer even though they had the same job classification.

347.

On information and belief Mr. Bond recommended the hiring and starting salary decisions of both Daphne Jones and Robert Trokey.

348.

Mr. Bond testified that he made the salary recommendations regarding Shemetha Jones.

349.

On information and belief, Mr. Bond made the salary recommendations regarding Janey Chauvet.

350.

On information and belief, Mr. Bond made the salary recommendations regarding Jamie Barber.

351.

On information and belief, Mr. Bond made the salary recommendations regarding Ms. Surratt.

352.

On information and belief, Mr. Bond made the salary recommendations regarding Ms. Buckner.

353.

On information and belief, Mr. Bond made the salary recommendations regarding Ms. McBride.

354.

On information and belief, Mr. Bond made the salary recommendations regarding Mr. Deitchman.

355.

On information and belief, Mr. Bond made the salary recommendations regarding Mr. Brown.

356.

On information and belief, Mr. Bond made the salary recommendations regarding Mr. Reinhardt.

357.

Mr. Bond testified that he made and continues to make recommendations regarding initial salary upon hire and subsequent salary increases for employees within the Utilities Division without reference to any salary ranges.

358.

At all relevant times Thomas Bond made the decisions relating to the starting and subsequent salaries for employees occupying the Analyst 1, 2 and 3 job titles, including plaintiff within the Utilities Division of the GPSC.

359.

Thomas Bond set the starting salaries of male employees doing the same work as female employees in the same job title within the Utilities Division of the GPSC.

360.

Mr. Bond had control over Plaintiff's employment since, on information and belief, his recommendations regarding employees' salaries within the Utilities Division of the GPSC were routinely accepted by the GPSC Board of Commissioners.

361.

Mr. Bond had control over Plaintiff's compensation since, on information and belief, his recommendations regarding employees' salaries within the Utilities Division of the GPSC were routinely accepted by the GPSC Board of Commissioners.

362.

Mr. Bond played a direct role in not paying Plaintiff the same wages as her male counterparts since he made the recommendations to the GPSC Board of Commissioners regarding the initial and subsequent salaries of the employees within the Utilities Division of the GPSC and his recommendations were routinely accepted by the GPSC Board of Commissioners.

363.

Mr. Bond is an "employer" within the meaning of 29. U.S.C. §203(d), and is subject to individual liability under that statute.

364.

At all relevant times and continuing, according to the Georgia Department of Personnel, all employees employed within the Utilities Division of the GPSC have the job title of Utilities Analyst 1, 2 or 3, regardless of the employees' backgrounds, specialties or degrees conferred. Thus, while Utilities Analysts may have accounting, engineering or economist training or backgrounds, they all have the same job title of Utilities Analyst 1, 2 or 3 according to the binding rules and regulations of the Georgia Department of Personnel.

365.

Mr. Bond acknowledged that all employees in the job title of Utilities Analyst 1 were in the same job title as far as the Georgia Department of Personnel was concerned, and the same is true with all employees employed in the job titles of Utilities Analyst 2 or Utilities Analyst 3.  The Georgia Department of Personnel did not and does not recognize any difference in the job titles with respect to whether the particular employee is an engineer, economist, accountant, or has any other specialty or background.

366.

The job duties all Utilities Analysts in any particular job title, whether

Utilities Analyst 1, 2 or 3 requires equal levels of effort, skill and responsibility.

Thus for example, job duties for all job titles within Utilities Analyst 1 require the

same level of effort skill and responsibility. Similarly the job duties for all Utilities

Analyst 2 require the same level of effort, skill and responsibility, and the same is

true for Utilities Analyst 3.

367.

The work of all Utilities Analysts is all performed at the same location under

similar working conditions.  This is true whether the Utilities Analyst is employed

as a level 1, 2 or 3.

368.

The Internal Consultants (IC) Unit, which is within the Utilities Division,

assists in cases for all other Utilities Division units at the GPSC and provides

expertise to all of the other units.

369.

Pandora Epps ("Ms. Epps"), the Director of Internal Consultants at the

GPSC within the Utilities Division of the GPSC affirmed that the job duties within

any level of Utilities Analyst position, whether Utilities Analyst 1, 2 or 3, requires

equal levels of effort, skill and responsibility.

370.

Pandora Epps also affirmed that the work of all Utilities Analysts is all performed at the same location under similar working conditions.  This is true whether the Utilities Analyst is employed as a level 2 or 3.

371.

When a filing is made by a utility, the GPSC may decide to issue what is known as a Procedural and Scheduling Order (PSO).

372.

The PSO may assign certain Utilities Analysts to either an Advocacy Team or an Advisory Team.

373.

Utilities Analysts are not advised that a PSO is in the process of being issued and are not given an opportunity to apply for either the Advocacy or the Advisory Team.

374.

Utilities Analysts first become aware that they have been assigned to either an Advocacy Team or an Advisory Team when the PSO is issued.

375.

On information and belief, assignments to either the Advocacy Team or the Advisory Team are made by management, including at all relevant times, Mr. Bond.

376.

Ms. Epps testified that the job duties of Utilities Analysts assigned to the either Advocacy or Advisory Teams require the same effort, skill and responsibility.

377.

Thomas Bond set the starting salaries of male employees doing the same work as female employees in the same job title within the Utilities Division of the GPSC.

378.

Female employees' starting salaries, including Plaintiff's as compared to similarly situated male employees in the same job title doing the same work, were routinely lower than the salaries for male employees.

379.

Higher starting salaries of male employees doing the same work as female employees, including plaintiff, in the same job title were not based on seniority, qualification, or experience or any factor other than sex.

380.

Thomas Bond made the salary decision relative to the Plaintiff and the male employees who occupied the same job title or lower job titles, who were paid more than Plaintiff.

381.

Plaintiff was paid less and continues to be paid less than male employees for the same work.

382.

Plaintiff was paid less and continues to be paid less than male employees for the same work on the basis of her sex.

383.

As a Director of the Utilities Division and officer under State of Georgia in O.C.G.A. § 46-2-7.1, and as the individual who at all relevant times had operational control over the Utilities Division, including directing the activities of Utilities Analysts, and making the salary decisions relative to Plaintiff and to males occupying either the same Analyst position or lower Analyst position for which Plaintiff was paid less than the males in the same or lower Analyst position,

384.

Defendants Thomas Bond's aforesaid actions violated the Equal Pay Act, 29 U.S.C. §206(d).

385.

Plaintiff has suffered damages because of Defendants' actions.

386.

Plaintiff is entitled to relief to remedy Defendants' actions.

WHEREFORE, Plaintiff seeks the following relief:

1.   Compensatory make-whole relief for Plaintiff's economic damages including but not limited to back pay;

2.   Damages for mental anguish;

3.   Punitive damages against Thomas Bond;

4.    Liquidated damages under the Equal Pay Act;

5.   Attorneys' fees, expert witness fees, costs and disbursements of this action;

6.   Appropriate declaratory and injunctive relief;

7.   Interest from an appropriate point until judgment is entered and post-judgment interest as may be proper;

8.   Such other and further relief as this Court deems appropriate; and

9.   Plaintiff demands TRIAL BY JURY.

This 13th day of April 2022.

s/Robert N. Marx
ROBERT N. MARX

81

Georgia Bar No. 475280
JEAN SIMONOFF MARX
Georgia Bar No. 475280
Marx & Marx, L.L.C.
1050 Crown Pointe Parkway
Suite 500
Atlanta, Georgia 30338
Telephone: (404) 261-9559
lawyers@marxlawgroup.com
Attorneys for Plaintiff